**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
EASTERN DIVISION**

**LISA JO CHAMBERLIN**                                                                    **PETITIONER**

**VS.**                                                       **CIVIL ACTION NO.: 2:11CV72CWR**

**MARSHALL L. FISHER, Commissioner,
Department of Corrections, and JIM HOOD,
Attorney General**                                                                    **RESPONDENTS**


## MEMORANDUM OPINION AND ORDER

Lisa Jo Chamberlin was convicted of two counts of capital murder, with the underlying offense of robbery, in the Circuit Court of Forrest County. The victims were Vernon Hulitt and Linda Heintzelman, who lived in Hattiesburg and were killed on or about March 20, 2004. Chamberlin's trial began on July 31, 2006, and, on August 4, 2006, she was found guilty on both counts of capital murder and sentenced to death. Chamberlin appealed the verdict and sentence, both of which were affirmed by the Mississippi Supreme Court. *Chamberlin v. State*, 989 So. 2d 320 (Miss. 2008). She then filed a petition for post-conviction relief, which was also denied. *Chamberlin v. State*, 55 So. 3d 1046 (Miss. 2011). Chamberlin timely filed a Petition for a Writ of Habeas Corpus in this Court on July 18, 2011.

## STATEMENT OF FACTS

Lisa Jo Chamberlin was born and raised in Oregon, which is where she met Roger Gillett. Chamberlin and Gillett soon moved in together, and they lived in Oregon for several months. Gillett had family in Russell, Kansas, and he and Chamberlin moved there for some period of time. During that time, Kansas law enforcement became aware that the couple might be manufacturing crystal meth, and an investigation began. Around the beginning of March 2004,

however, before any warrants could be served, Gillett and Chamberlin moved to Hattiesburg, Mississippi.

Near the end of March, Kansas authorities learned that Chamberlin and Gillett were back in Russell, and the Sheriff's Department set up surveillance on a farm about sixteen miles out of town that belonged to one of Gillett's relatives. On March 29, Gillett and Chamberlin were taken into custody on drug charges. Chamberlin was questioned later that day, and she originally said that she thought she should ask for an attorney. While discussing that issue with the officer, she agreed to talk, and she gave him some identification information. She signed a form acknowledging her rights, but then she declined to answer questions.

As part of the drug investigation, deputies obtained a search warrant for the farm. In addition to drug-related material or equipment, they were looking for a stolen white pickup, similar to one that a neighbor had reported seeing on the property. During their search, deputies found a white pickup truck with Mississippi tags inside a metal building. The deputies also entered a wooden granary, where they found a freezer that was plugged in and taped shut. Fearing that the freezer contained dangerous material for making meth, deputies backed out of the granary and waited for other agents to arrive.

When those other agents arrived and opened the freezer, they found something far worse than expected - - a male body wrapped in a brown blanket. Immediately, they obtained another warrant to search the farm for evidence of a homicide. The body was pulled out of the freezer, and a female body was discovered underneath. The female body was frozen in fluid at the bottom of the freezer, and that fluid had to be thawed before the body could be removed. The bodies were ultimately identified as Vernon Hulett and Linda Heintzelman. Hulett had been decapitated and his arms had been severed at the shoulders. Heintzelman had duct tape wrapped

around her mouth and head. A plastic bag was affixed to her head by duct tape wrapped around her neck. Her hands were secured at the small of her back with duct tape.

Following this discovery, officers interviewed Chamberlin again. This interview was not videotaped; however, Special Agent Delbert Hawell made a report of the interrogation. Later, officers interviewed Chamberlin once more to clear up some inconsistencies between her statement and the evidence, and a report was also made of that interview. Two additional videotaped interviews followed. In the first of these two, Chamberlin told how she and Gillett got to Hattiesburg, but, when she began to relate the events of the evening of the murders, she was overcome by emotion and could not give any more information. In the second, she gave a full statement of the events that culminated in the deaths of Hulett and Heintzelman. In each interview, Chamberlin was progressively more forthcoming about her own involvement in those events, and from those interviews, as well as evidence and testimony presented at trial, the Court has ascertained the facts that follow.[1]

Chamberlin and Gillett moved to Hattiesburg in early March 2004 to live with Gillett's cousin, Vernon Hulett, and Vernon's girlfriend, Linda Heintzelman. Hulett worked for the City of Hattiesburg's Sanitation Department. Gillett obtained "day jobs" through a job center. Neither Heintzelman nor Chamberlin worked. A few days after Gillett and Chamberlin arrived, the two couples were driving to the Gulf Coast in their separate vehicles when Heintzelman suddenly changed lanes in front of them, causing Gillett to run into her. Gillett and Chamberlin's car was severely damaged and could not safely be driven. Heintzelman's pickup sustained only minor damage. Heintzelman told Gillett and Chamberlin that she would submit the accident as a claim on her insurance and give them part of the money to fix their vehicle.

---

[1] The details are gory, but they paint a necessary picture of the depravity and havoc Chamberlain and her co-defendant created.

Apparently, the claim was never made, and it became a matter of contention between the couples.

After some time in Hattiesburg, the relationship between the couples soured. One day, after all four of them had been drinking, Hulett and Heintzelman suggested that Gillett and Chamberlin move out. The tension caused Chamberlin and Gillett to argue, and, finally, Chamberlin left the house, intending to hitchhike to Oregon. She got a ride to a truck stop one to two hours away. Unable to find another ride, Chamberlin began walking back toward Hattiesburg, and she ultimately got a ride back. When she entered the house, everyone was arguing. Hulett was accusing Gillett of hitting Chamberlin in his house, although Chamberlin said that was not the case.

Chamberlin wanted to load their things into their car and leave, but Gillett wanted to stay the night. Chamberlin went into the kitchen and got two beers from the refrigerator, but Hulett grabbed her and told her that she could not have them. At that point, Gillett picked up Heintzelman and slammed her onto the kitchen counter. Gillett instructed Chamberlin to get his gun from under the mattress in the bedroom, which she did. Gillett then fired the gun into the floor, and, during the commotion, got the keys to the pickup from Heintzelman. Chamberlin went outside to pull the telephone wires from the house, so that Hulett could not call police, but Gillett had already cut them. Chamberlin took the gun outside and fired a shot at the truck tires, but Gillett came outside and told her not to shoot out the tires of their "getaway car." She brought the gun back into the house with one bullet in it.

Gillett then began to beat Hulett, trying to get the combination to a safe that Hulett kept in his closet. Hulett refused to reveal the combination, so Gillett instructed Chamberlin to go into the bedroom with Heintzelman and retrieve the safe. At that point, Chamberlin wanted to

burn the house down and leave, so she lit the gas heater in the bedroom, but Gillett came in and turned it off. Heintzelman could not remember the combination to the safe, and said that only Vernon's mother knew it. Hulett ultimately told them the combination, although they were never able to open the safe using it. In a rage over the damage to her car, Chamberlin went through the house, turning over dressers and the refrigerator.

Gillett continued to beat Hulett until Hulett finally went to his bedroom, saying that he had worked hard that day and was tired. At around 1:30 a.m., Chamberlin took Heintzelman's truck to buy beer before the 2:00 a.m. cut-off. She was unsuccessful in that attempt and returned to the house about an hour later. Hulett was still in bed, and Heintzelman was bent over the safe with her pants off. Gillett had a couple of beers he had found under the refrigerator. Chamberlin asked him whether he had sex with Heintzelman, and he said that he had made her undress in order to "break" her, and that he had penetrated her with a beer bottle. Chamberlin went to the kitchen and got a piece of chicken. After she ate it, she told Heintzelman to insert the chicken bone into her anus, which Heintzelman did.

Hulett came back out of his bedroom and told Heintzelman not to open the safe, but they all sat in the dark while Heintzelman tried to pick the lock. Finally, Chamberlin told Gillett that they should "kill them and get this over with and get the fuck out of here." At Gillett's request, Chamberlin retrieved a box knife from Hulett's tool room; however, when Hulett sat down in his chair, Gillett hit him in the head with a hammer. Heintzelman still would not open the safe, so Gillett instructed Chamberlin to strangle her. She grabbed Heintzelman's windpipe, but Heintzelman was too strong for Chamberlin to choke her. Chamberlin got a knife from the kitchen so Gillett could stab Heintzelman, and Gillett told Chamberlin to wait out in the truck while he did it. When she went back in the house, she saw that Hulett was bloody and that

Heintzelman was lying on the floor. Both of them were still breathing. Chamberlin then tried to open the safe, but was unsuccessful. Frustrated, she asked Gillett, "Are you going to kill them or not?" Gillett indicated that he would. While Chamberlin was loading their belongings into the pickup truck, Gillett slashed Hulett's throat.

Gillett told Chamberlin, "It's done," and they left in the pickup truck, with Chamberlin driving. Gillett threw the hammer and the knife out of the truck onto the highway. After driving for an hour or two, at around daybreak, they returned to the house to "finish what we started." When they returned, Hulett appeared to be dead in the chair, but Heintzelman was on the floor, still breathing. Gillett said, "I'm glad we came back." He showed Chamberlin Hulett's slashed throat, then they covered both of them with blankets and went in their bedroom to sleep. Chamberlin could not stay in the house and went to sleep in her car around 6:30 or 7:30 a.m. After about three hours, Chamberlin went back in the house to find Gillett on the sofa and Heintzelman on the floor, still breathing. Chamberlin and Gillett went out into the front yard, where they spent most of the day.

Heintzelman was clinging to life, so Chamberlin suggested to Gillett that they strangle or smother her. When Gillett asked how they would do it, Chamberlin suggested putting a bag over Heintzelman's head. She gathered some plastic bags from around the house, and, when Heintzelman began to struggle, they bound her hands behind her back with duct tape. Gillett asked Chamberlin whether she'd rather hold Heintzelman's head or put the bag over it, and Chamberlin said she would put the bag on. Then Gillett lifted Heintzelman's head, so that Chamberlin could put the bag over it. He told Chamberlin, "I can't do this by myself," but, at that point, Chamberlin said she could not help him. Gillett put the first bag over Heintzelman's head, and Chamberlin helped with the other two bags. Heintzelman began making noises and

they were afraid a neighbor would hear her, so Gillett put a pillow over Heintzelman's head and smothered her. Chamberlin went outside for a short time, and, when she came back, she heard Heintzelman take her last breath.

Nonchalantly, Gillett and Chamberlin decided that they would spend one more day in Hattiesburg with Hulett's mother and nephews, then cut up the bodies, bury them, and burn the house down. By that time it was mid-afternoon, and Hulett's nephew, Michael Hester, who was seventeen, and Michael's thirteen-year-old brother, Mitchell, stopped by after school, as they customarily did. Michael and Mitchell lived with Caroline Hester, who was their grandmother and Hulett's mother. Gillett and Chamberlin told them that Hulett and Heintzelman had left town with friends, and, to avert suspicion, they went with the boys to the zoo, to play basketball, and to Caroline's house to eat. When they returned that evening, they decided to clean up the house. They stripped the carpet off the living room floor and took the bodies into the bathroom. Chamberlin took some sleeping pills, then she and Gillett went to bed and slept through the night.

The next day was Monday, and one of the boys skipped school and stopped by the house. Chamberlin and Gillett said they would meet him at Caroline's house, and, on the way there, Gillett suggested that they put the bodies in Hulett's deep freezer and take them to Kansas. They spent some time at Hulett's mother's house, then went home to prepare the bodies for the freezer. Although the original plan was to cut the heads and hands off both bodies, they did not dismember Heintzelman's. While Chamberlin watched for cars and then held the garbage bags, Gillett cut off Hulett's head and arms with a pruning saw and put the body parts into the bags. They turned Hulett's deep freezer on its side, loaded Heintzelman's and Hulett's bodies into it, and taped the freezer shut with electrical and duct tape. Then they went through the house and

gathered up six or seven garbage bags full of evidence. They loaded the freezer and the garbage bags into the truck and left for Kansas the next morning, with a plan to return at some point and burn Hulett's house down. In her statement to law enforcement, Chamberlin said that they left Mississippi on March 22 and arrived in Kansas on March 23. She thought that the fight occurred on March 19.

After returning to Kansas, Chamberlin and Gillett left the freezer at a relative's farm in the country. They tried to drive the pickup truck as little as possible, in case it had been reported stolen, and they stayed with some of Gillett's relatives. Though they had no money, Chamberlin and Gillett had a burning desire to earn some. Of course, they would not choose legal means to earn money. In fact, they had brought with them supplies for setting up a meth lab. They were offered an opportunity to produce a batch of meth for a meager $500.00, so they took the pickup, along with the necessary supplies, out to the farm and produced the batch. A relative left with the drugs to sell. Chamberlin and Gillett were arrested in Russell the next day.

Following her confession, Chamberlin took officers to Russell's city dump to retrieve the evidence that had been discarded there. After Chamberlin directed them to the location where the garbage had been left, officers recovered seven trash bags. The bags contained, among other things, Hulett's work clothes and driver's license, Heintzelman's purse, a bloody pillow, and a Hattiesburg phone book.

Hattiesburg police were alerted that a pickup truck with a Mississippi tag had been found in Kansas, along with two bodies. Local law enforcement officers ran a check on the tag and found that it belonged to Linda Heintzelman. They went to Hulett's and Heintzelman's home to do a welfare check, where they found a car with Kansas tags and front end damage. The house was locked, and they saw a ceiling fan running. Officers knocked at the door, but no one

answered.  After Kansas authorities notified the Hattiesburg officers of Chamberlin's confession, the Hattiesburg officers went back to the house to process it as a crime scene.  The house was neat, but there was no carpet in the living area.  Additionally, the officers found blood on the floor and the furniture, and the mattress in one of the bedrooms was soaked with blood.  They also found a safe with pry marks on it.

Dr. Donald Pojman, the pathologist who performed the autopsy on Heintzelman and Hulett, reported numerous injuries to each of them.  Specifically, Heintzelman had twelve separate blunt-force injuries to her head that caused lacerations – primarily on the back of her head.  Those injuries were consistent with being struck with a hammer.  She had a large cut on the front of her right thigh, and there were two additional cuts in the hip region on the right side. There were several cuts on her neck and abdomen, and a scrape under her left eye.  Some of the cuts on her neck were relatively superficial; others went through the skin to the muscle, but did not strike any major blood vessels.  The cuts on the abdomen went through the skin to the underlying fat tissue.  Heintzelman had several stab wounds and long cuts on her back.  There were cuts on her hands that were consistent with defensive injuries.

The pathologist concluded that Heintzelman died from multiple injuries.  "She died from the sharp-force injuries of the torso and the neck.  She also died from blunt-force injuries of the head and from asphyxiation, which would be the blockage of air or blood vessels getting to the lung such as strangulation or putting something over a person's mouth."

Dr. Pojman testified on cross-examination that none of the injuries alone would have killed Heintzelman.  While the cuts could have caused significant blood loss over a long period of time, they did not involve any major blood vessels.  The blows to the head, while causing fractures, did not cause actual brain damage.  Therefore, while she might have been unconscious

right after she was hit, she would not have died immediately from the blows. The tape over her mouth would not have prevented her breathing through her nose, although a fracture to her neck might have interfered with her breathing. Because she could have survived that injury for some period of time, Dr. Pojman believed that it was the combination of injuries that likely caused Heitzelman's death.

Hulett had several superficial cuts and abrasions on his face, head, and neck. The more significant injuries were to his head, above his left ear. There, the autopsy revealed five semi-circular lacerations that went through the skin. The lacerations resulted in a large fracture of the skull, approximately four by three inches, where the skull was actually pushed into the brain, resulting in brain injury. The injuries were consistent with being hit with a hammer. Hulett also had minor wounds to his arm. According to Dr. Pojman, Hulett died from the blunt-force injuries to the left side of his head.

Martha Petrofsky, who was an inmate at the Forrest County Jail at the same time as Chamberlin, testified about statements that Chamberlin made to her about the crime. According to Petrofsky, Chamberlin and Gillett came to Mississippi to sell drugs and use the money to go elsewhere. Chamberlin told her that the couples had a "blowup" over the damage done to Chamberlin's vehicle, and Chamberlin was physically involved to the extent of hitting Heintzelman in the head with some object and kicking her in the side. Chamberlin also held Heintzelman's head up while Gillett slapped Heintzelman and told her that he was going to "break" her if she did not give them the combination to the safe. Petrofsky said that Chamberlin told Gillett, "Well, you're going to have to get a little rougher than that." It was Petrofsky's impression that Chamberlin egged Gillett on. Chamberlin told her that they had sex after the murders. Chamberlin also said that she "was caught up in the moment of it, but she regretted

getting caught because there was too many other ways they could have gotten rid of those bodies without being caught with them."  Another inmate, Vanessa Stringfellow, testified that she heard Chamberlin tell other inmates, "After we cut his throat, we propped him up on the couch, and his head was hanging to one side, and we proceeded to have sex in front of the corpse, and it was the greatest sex that [we] ever had and it was an extreme adrenaline rush."

After the jury found Chamberlin guilty of capital murder, three witnesses testified on her behalf during the sentencing phase.  Sherry Norris was in jail with Chamberlin, and she testified that Chamberlin gave her food and a blanket and comforted her.  She saw Chamberlin shortly after Chamberlin talked to her son, Gabriel, and she said that Chamberlin was crying because Gabriel had gotten into some trouble.  Carla DiBenetto was also in jail with Chamberlin, and she developed a friendship with her that had continued after DiBenetto's release.  DiBenetto said that Chamberlin gave her good advice, and she thought that Chamberlin could do the same for other people.  She testified that Chamberlin loved her children dearly.  Both Norris and DiBenetto asked the jury to spare Chamberlin's life.

Chamberlin's primary mitigation witness was Dr. Beverly Smallwood, a psychologist. Dr. Smallwood spent over twenty hours interviewing Chamberlin and performing psychological testing.  She also interviewed persons who knew Chamberlin to learn more about Chamberlin's background and history.  Among those interviewed were Chamberlin's aunt, Loma Wagner; her mother, Twila Speer; a childhood friend; and the son of an elderly woman who was cared for by Chamberlin.

After talking to Chamberlin and these witnesses, it was apparent that abuse and neglect were a central part of Chamberlin's life.  As a small child she saw and experienced abuse: verbal, physical and sexual, something which Chamberlin described as "normal."  The abuse came from

men and women, family members and non-family members alike. The abuse continued into adulthood. Dr. Smallwood's assessment of Chamberlin's early life follows:

> In Lisa's childhood she was abused in multiple ways. Her biological father was physically abusive to her. He was also physically abusive to her mother. Her parents divorced when she was about three or four. But he had abused her severely.

> Lisa's mother was bipolar, had bipolar disorder, and she was also a severe alcoholic. She also physically abused Lisa Jo. And she acknowledged this to me herself as well as other family members with whom I talked.

> Lisa was physically and sexually abused by her brother. It's actually a half brother. And this occurred when her mother would be out doing what she did in terms of being with men and bringing home men. I also did mention that Lisa's mother also verbally abused her according to Lisa's friend, Veronica, in whom Lisa confided during those early years. And she also heard this herself. Lisa's mother would call her a slut and a whore and, "You're going to grow up to be just like me." So this was the kind of prophesies that she had over her life.

> Additionally, then her mother got remarried and she had a stepfather. And that stepfather also physically abused Lisa. He also physically abused his own daughter, which was Lisa's stepsister.

> Additionally, in the fourth grade, a fourth grade teacher sexually abused Lisa. Not only her but some other girls in the process, and this did come to light and definitely impacted her school performance at that time. There apparently was a significant change in her involvement and engagement in school at that point in time.

Dr. Smallwood was asked how this history would have impacted Chamberlin's relationships with men. She gave the following answer:

> I was so struck as Lisa told me about some of these abusive experiences with men early in her life, particularly her stepfather. In one breath she would say it was a good relationship, and in the next breath she would talk about being beaten and strangled. And then she would say, and it was a good relationship. I was his favorite.

> And what happened through those times was that Lisa came to expect abuse to be the normal thing. That was just the way it was. So she continued to become engaged in abusive relationships with men and really kind of saw those as normal.

Also, even though she had been sexually abused, she also devalued herself to the point that she did act out sexually and had not just ongoing relationships with certain men but casual sexual relationships. And these were I believe direct outgrowths of the kind of learning that she had as a very young child about her own worth and about just whether she had the right to have anything else happen in her life.

According to Smallwood, Chamberlin had three children – two sons and a daughter – by three different men. The father of her second child was extremely abusive to Chamberlin, and it was through him that she met Gillett, who had been in jail with him. Her relationship with Gillett was stormy; Chamberlin told Dr. Smallwood that he had once tried to drown her. Despite this abuse, Chamberlin stayed in the relationship.

Based on her research, testing, and expertise, Dr. Smallwood offered the following psychological assessment of Chamberlin:

Lisa had – from the traumatic experiences in her past as well as the things which you're very aware, Lisa experienced some symptoms of posttraumatic stress disorder. Additionally, she had severe methamphetamine addiction. Lisa started drinking when she was about twelve years old. She started using meth at thirteen to get out of the abusive household. She said it was easier to come back in and experience what that household was like if she was stoned. She maintained that meth addiction until she was incarcerated.

Additionally, she meets the criteria for receptance of borderline personality disorder, which is a severe personality disorder that's often seen in people who have been through abusive backgrounds.

Based on this information and her expertise, Dr. Smallwood offered this explanation of how Chamberlin's psychological state affected her actions during the murders of Hulett and Heintzelman:

I guess the way I would sum it up is as an accumulative effect and growing mental and emotional disturbance on the day that these crimes were committed and the days thereafter. This isn't a very clinical term, but I'll just say it this way and I think we'll all understand it. Lisa was a psychological mess. And it had grown starting in her early childhood with things that she couldn't help but then choices that she made over time and not having the tools, having never had role models or a support system and having not taken some of the opportunities that

she did have.  When she got to that day, the day that these crimes were committed, she was a life spun out of control.

When asked whether Chamberlin was an antisocial person or a psychopath, Dr. Smallwood answered:

Lisa has certainly lived an irresponsible lifestyle.  She has made some very poor decisions in her life, so there are elements of the diagnosis of antisocial personality disorder that she does fit the criteria.  Due to that irresponsibility – I've already mentioned to you that she was a meth addict for basically twenty years.  If you've ever been around or had someone in your family who had a drug addiction, you know that when a person is living that lifestyle they are extremely irresponsible and the addiction to a drug often takes precedence even over people that they love.

So she does have many of those characteristics in that she's made some very poor choices.  However, when it comes to the element of interpersonal callousness we sometimes think of with someone who is a true psychopath so that the person really doesn't have a conscience or they really have no remorse or they aren't connected with people even though – I mean you've been sitting in this courtroom and you've been horrified by the evidence just as I was when I had to wade through all of the discovery.  So there was certainly some horrible and callous behavior that went on.

After nearly three hours of deliberation, the jury sentenced Chamberlin to death for each murder.  After the sentence was announced, Chamberlin made the following statement:

I just want to apologize to the families of the victims.  I'm very sorry.  I know that you won't get to spend Christmas or Thanksgiving with your children and my family will.  I don't have any hate towards any of you for what my sentencing is.  I feel that I deserve it, and I just want to say I'm sorry.

The court held a hearing on Chamberlin's motion for a new trial, at which she argued that her statements were coerced and that the trial judge erred by refusing her proffered mercy instruction.  The motion was denied.

## STANDARD OF REVIEW

English courts have had the authority to issue a writ of habeas corpus to test the legality of a prisoner's detention by the sovereign since the Middle Ages.  *McNally v. Hill*, 293 U.S. 131,

136 (1934); William Blackstone, 1 *Commentaries* *131 (tracing the law to the reign of Edward I).  The thirteen original colonies modeled their habeas statutes after that common law, as well as the Habeas Corpus Act of 1679.  *Boumediene v. Bush*, 553 U.S. 723, 742 (2008). When the United States was formed, the right to habeas corpus was indirectly guaranteed by the Constitution, which directed that the writ "shall not be suspended, unless when in Cases of Rebellion or Invasion the public Safety may require it."  U.S. Const. art. 1, § 9, cl. 2.  Federal judges were ultimately empowered to issue the writ by the Judiciary Act of 1789, but their authority was limited to the release of federal prisoners.  *Fay v. Noia*, 372 U.S. 391, 415, 428 (1963).

The later-conceived expansion of federal authority to review *state court* judgments has been controversial since its inception in the Force Act of March 2, 1833.  *Id.* at 401 n.9.  The writ in this country "has a history bound up in the expansion of federal supervision over the States and the genesis of modern civil rights, and in particular the movement toward racial equality."  *Burdine v. Johnson*, 262 F.3d 336, 350 (5th Cir. 2001) (Higginbotham, J., concurring). Historically, the writ was used to release persons who had been imprisoned without a trial.  *Brown v. Allen*, 344 U.S. 443, 533 (1953) (Jackson, J., concurring).  In *Brown*, however, the Supreme Court expanded the writ to empower a federal court to grant habeas relief to free a prisoner who had been tried in state court, but whose conviction was based on constitutional error.  *Id.* at 458.  The practical effect of *Brown*, according to Judge Higginbotham in *Burdine*, was to "replace[] direct review in the Supreme Court of state convictions by enlisting the lower federal courts in the task of reviewing claims of constitutional deprivation ensuing from state criminal convictions."  262 F.3d at 351.[2]

---

[2] In his concurring opinion in *Brown*, Justice Jackson reported that the expansion of the writ had already resulted in "floods of stale, frivolous and repetitious petitions."  344 U.S. at 536.  In support of that statement, he noted that the

In 1988, Chief Justice William Rehnquist asked Justice Lewis Powell, who had recently retired from the Court, to head an Ad Hoc Committee on Federal Habeas Corpus in Capital Cases. In a Commentary published in the Harvard Law Review the next year, Justice Powell noted that the number of habeas petitions filed in federal district courts had risen at a pace that even Justice Jackson could not have foreseen – from 127 in the judicial term beginning in 1940 to 9,542 in 1987. Lewis F. Powell, Jr., *Capital Punishment*, 102 Harv. L. Rev. 1035, 1039 (1989). Describing the process by which a death-sentenced inmate could seek state and federal review, Justice Powell concluded that an inmate could have as many as seven or eight judicial examinations of his case. *Id*. Even after that, intrepid counsel could find new arguments and advance plausible reasons for failing to raise those arguments earlier, thereby further prolonging the process. *Id*. at 1039-40. Compounding the problem was the frequency with which the courts permitted last-minute stay applications, which, in his opinion, "imposes additional burdens on the courts, and often prevents the mature and thoughtful consideration our system expects." *Id*. at 1040. As of August 1, 1988, this cumbersome process had resulted in a nationwide death row population of 2,110, with only 100 executions taking place in the sixteen years since the decision in *Furman v. Georgia*, 408 U.S. 238 (1972). *Capital Punishment*, at 1038. Additionally, the time between the murder and the execution averaged close to 10 years in one state. *Id*.

The Ad Hoc Committee made several recommendations for overhauling federal habeas law. Congress reviewed the Committee's findings, held hearings both in the House and in the Senate, and passed the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). Pub. L. No. 104-132, 110 Stat. 1214 (codified at 28 U.S.C. § 2254 (2006)); *Baze v. Rees*, 553 U.S. 35,

---

number of habeas petitions challenging state court convictions had risen in the federal district courts from 127 in 1941 to 541 in 1952. *Id.* at 536 n.8.

69 (2008) (Alito, J., concurring) (stating that AEDPA "was designed to address this problem.").

According to the Conference Committee Report that attended the passage of the bill:

> This title incorporates reforms to curb the abuse of the statutory writ of habeas corpus, and to address the acute problems of unnecessary delay and abuse in capital cases. It sets a one year limitation on an application for a habeas writ and revises the procedures for consideration of a writ in federal court. It provides for the exhaustion of state remedies and requires deference to the determinations of state courts that are neither "contrary to," nor an "unreasonable application of," clearly established federal law.

H.R. Rep. No. 104-518, at 111 (1996) (Conf. Rep.).

The standard of review referenced in the Report is codified at 28 U.S.C. § 2254, which

provides:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim --
>
>> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>>
>> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.
>
> (e)(1) In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

28 U.S.C. § 2254. Under this statute, where the state court adjudicates the petitioner's claim on

the merits, this court reviews questions of fact under § 2254(d)(2), while questions of law or

mixed questions of law and fact are reviewed under § 2254(d)(1). Factual findings are presumed

to be correct, and the reviewing court defers to the state court's factual determinations.

*Harrington v. Richter*, 562 U.S. 86, 101 (2011). The court reviews questions of law and mixed

questions of law and fact to determine whether the state court's decision was either "contrary to" or an "unreasonable application of" federal law. *Williams v. Taylor*, 529 U.S. 362, 407-13 (2000).

"Even in the context of federal habeas," however, "deference does not imply abandonment or abdication of judicial review." *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003). "Deference does not by definition preclude relief. A federal court can disagree with a state court's credibility determination and, when guided by AEDPA, conclude the decision was unreasonable or that the factual premise was incorrect by clear and convincing evidence." *Id.*

AEDPA "work[ed] substantial changes" to the law on habeas corpus in federal courts. *Felker v. Turpin*, 518 U.S. 651, 654 (1996). In 2000, the Supreme Court, in a plurality opinion, addressed and explained the meaning of AEDPA's standard of review. *Williams*, 529 U.S. at 402-13. Justice O'Connor authored the portion of the opinion that explained the appropriate standard of review under AEDPA, and she emphasized that "federal law" for purposes of AEDPA is limited to the holdings of the Supreme Court of the United States. *Id.* at 412. *Clearly established* federal law is that which exists at "the time of the relevant state-court decision" on the merits of the claim. *Id.*; *Greene v. Fisher*, 132 S. Ct. 38, 44-45 (2011). A state court's adjudication of a claim is *contrary to* clearly established federal law "if the state court applies a rule different from the governing law set forth in [the Supreme Court's] cases, or if it decides a case differently than [the Supreme Court has] on a set of materially indistinguishable facts." *Bell v. Cone*, 535 U.S. 685, 694 (2002). A state court's application of the correct legal precedent to the particular facts of a petitioner's case will be an *unreasonable application* of the law if it identifies the correct federal law but unreasonably applies it to the facts, unreasonably extends the correct legal principle "to a new context where it should not apply[,] or unreasonably refuses

to extend that principle to a new context where it should apply." *Williams*, 529 U.S. at 40 (citation omitted). The term "unreasonable" was distinguished in *Williams* from "erroneous" or "incorrect"; thus, a state court's incorrect application of the law may be permitted to stand if it is, nonetheless, "reasonable." *Id*. at 410-11.

Recent decisions have reaffirmed this interpretation of AEDPA, noting that the appropriate standard of review is much more rigorous in a habeas case than on direct review. *Renico v. Lett*, 559 U.S. 766, 773 (2010). As the Court has explained, "If this standard is difficult to meet, that is because it was meant to be. . . . It preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents. It goes no farther." *Richter*, 562 U.S. at 102. Due to the intrusive effect of the writ of habeas corpus on state court decisions, the Court reasoned:

> As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.

*Id*. at 103.

Three months after issuing its opinion in *Richter*, the Court limited the scope of habeas review of the facts in *Cullen v. Pinholster*, 131 S. Ct. 1388 (2011). There, the Court held that habeas review conducted under § 2254(d)(1) must be limited to the record that was considered in state court. *Id*. at 1398-1400. The basis for the ruling was "Congress' intent to channel prisoners' claims first to the state courts." *Id*. at 1398-99 (citation omitted). A district court may still conduct hearings, under § 2254(e)(2), where a petitioner has failed to develop the factual basis of his claim in state court, but the circumstances under which such a claim may be raised are severely limited. *Id.* at 1400-01.

The Supreme Court's interpretation of federal habeas law compels this Court to undertake a rigorous examination of habeas claims, with an eye to protecting the state court's judgment from federal interference. That review must be based solely on the record before the state court and must give the state court's decision the benefit of the doubt, unless it "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Richter*, 562 U.S. at 103. This is the standard with which this Court has reviewed Chamberlin's claims. Based on this standard, and for the reasons that follow, Chamberlin is entitled to habeas relief on one issue.

## ANALYSIS

**GROUND TWO[3]:** **Ms. Chamberlin was denied her right to due process of law when the prosecutor exercised peremptory challenges against African-Americans in violation of *Batson v. Kentucky*, 476 U.S. 79 (1986).**

Chamberlin claims that the prosecutor improperly struck black veniremen from her jury, in contravention of the well-recognized principles of *Batson v. Kentucky*. At issue are strikes against the following black jurors: Emma Roberts (Juror Number 5), Geralline Wilkerson (38), Brittany Burks (81), Katrina Carpenter (92), Thomas Sturgis (104), David Minor (106), and Gloria Broome (117).

### A. Procedural History

Prior to trial, counsel had jointly sent a questionnaire to all of the potential jurors. At the end of voir dire, as soon as the State exercised its peremptory challenges on Roberts and Wilkerson, defense counsel objected that they were struck because of their race. The trial judge said, "I don't know that two strikes is going to – I don't believe two strikes establishes a pattern." The prosecutor immediately responded to the objection, stating, "It was the questions on the

---

[3] Chamberlin presents thirteen grounds for the court to consider. Because she is entitled to relief on her second ground, the Court declines to consider the remaining grounds.

questionnaire of Emma Roberts, questions 24, 25, 28, 30, 34, 35, and finally 54.  And as a matter

of fact, that was one of the people we asked the Court to strike for cause, and it's in the record all

the questions that we objected to."  Defense counsel disagreed that there was a challenge for

cause on Roberts and added, "Right now we've got a pattern.  The State has exercised two

strikes . . . ."  The trial judge interrupted: "Wait stop.  Like I said, I don't think two strikes is a

pattern.  I'm going to go forward, and we'll come back to this.  I think you're premature at this

time."

        Later in the process, the State struck Brittany Burks.  Defense counsel again objected,

"Your Honor, at what point do you want to deal with this, Your Honor?  I'm going to make a

record as we go.  This is a black female, and the record should so reflect.  At the appropriate

time, we'll come back and visit it."  The trial judge responded, "Okay."  When the State struck

Katrina Carpenter, defense counsel noted, "S-5 is another black female, Your Honor.  So now

four out of five strikes are going to African Americans."  Without further comment from the trial

judge, the prosecutor used his next strike on Thomas Sturgis.  Defense counsel argued, "Your

Honor, at this point, this is a black male.  At this point the State has exercised six strikes, and

five of those strikes have been against African Americans, and I submit there's clearly a pattern

here."  The trial judge replied, "Okay.  And we'll come back to that."  Shortly thereafter, the

State struck David Minor and Gloria Broome, and defense counsel noted that they were both

black.

        After the jury selection process had been completed, defense counsel renewed his

objection to the State's peremptory strikes of black jurors.  The prosecutor responded with his

reasons for striking Roberts, all of which related to her answers to questions specifically

involving the death penalty.  At that point, the trial judge observed that the defendant was white,

and there were two African Americans on the jury. He then asked defense counsel whether he was "going to try to make your prima facie case to meet your burden before we even go to the excuses?" That attorney responded, "My prima facie case is that seven out of twelve constitutes a pattern, and particularly – I mean of those that were available of the first, I believe seven of the first eight strikes went to African American jurors. I submit that constitutes a pattern with an inference of discrimination." The prosecutor countered that he had struck seven black jurors and five white ones, which was close to 50/50, demonstrating no pattern. He added that defense counsel had also struck black jurors, which defense counsel admitted. Without specifically ruling on whether a prima facie case had been established, the trial judge said, "All right. Let me hear your race neutral reasons. You've already explained for Juror No. 5 [Roberts]."

To justify striking Wilkerson, the prosecutor argued that her questionnaire responses on the death penalty justified the strike. He then advanced reasons for striking Burks, which were based on her responses to the death penalty questions, as well as her having a family member with a drug charge. The strikes of Carpenter, Sturgis, Minor, Broome, and an alternate juror were also based on their responses to death penalty questions. The trial judge ruled:

> Due to the make-up of the panel, I'm not confident that the defense has made the prima facie case, has met your initial burden; however – and it is probably moot because our Supreme Court says if I don't find that you have met that initial burden that it is not necessary and it will be moot any [sic] race neutral reasons expressed by the State only to be considered by the Court. Hesitation, requiring the State to meet a higher burden than is required by law, the inability to – or hesitancy to announce that is their verdict, all of the reasons expressed by the State this Court does find to be race neutral.

Defense counsel responded that a prima facie case had been established and that some of the reasons advanced by the prosecution were pretextual. He explained:

> As to the reasons which the State has given, there's a couple of jurors I specifically would like to address. 104 in particular is a man whose name is Thomas Sturgis, African American. He was an administrator at Alcorn State

University. In his questionnaire he stated that he generally favors the death penalty.

And in a comment in response to question No. 56 he said, "I am fair and open-minded and have the ability to assimilate information and reach – or form a conclusion or an opinion." So we would submit that this is a man who, when I first read these questionnaires, struck me as being someone who would be a very appropriate juror.

And we would submit as to Juror No. 104 the reasons submitted by the State do not overcome the inference of prejudice.

No. 106. Also, we would note the State struck number 106, Mr. David Minor, someone who we'd point out has a nephew with the highway patrol. The State accepted other jurors with law enforcement connections. His opinion on the death penalty was he had no opinion. And, also, he's worked for the Vicksburg fire department for twenty-eight years.

As to number 117, Gloria Broome, she stated in her questionnaire she has no opinion as to the death penalty.

As to Juror No. 229, the alternate juror that was struck, Audrey Brown, she also stated that she has no opinion.

We would submit, Your Honor, on those last four that I read, Mr. Sturgis, Mr. Minor, Gloria Broome, and Audrey Brown, that if you look at the totality of their questionnaire, it appears that they could be absolutely open- and fair-minded jurors on the question of the death penalty.

After the trial court refused to change its ruling, defense counsel added:

One more point I'd make for the record, Your Honor. When the State asked for individual voir dire of the jurors on the issues of those who were strongly imposed on the Witherspoon case, they did not individually voir dire No. 38 [Wilkerson], No. 81 [Burks]. . . . No. 92 [Carpenter] they did not. 104 [Sturgis] they did not. 106 [Minor] they did not. And 117 [Broome] they did not. I just wanted to make the record complete.

This issue was raised in Chamberlin's direct appeal and rejected by the Mississippi Supreme Court. In denying relief, the court recited the reasons given by the prosecutor for striking each of the jurors. Then it addressed Chamberlin's contention that the trial court erred "by not making a clear determination that Chamberlin had established a prima facie case of

discrimination by showing that the State had exercised seven of its twelve peremptory challenges to strike black jurors from the regular panel." *Chamberlin*, 989 So. 2d at 338-39. The court held that the argument was "moot since all three steps of the *Batson* analysis were completed." *Id.* at 339 (citing *Hernandez v. New York*, 500 U.S. 352, 359 (1991)). It went on to hold that, since Chamberlin had offered no rebuttal to the State's explanation of the first four strikes, she was procedurally barred from arguing on appeal that the reasons were pretextual. *Id.* For the remaining three jurors, the court held that Chamberlin had "failed to offer any proof that the State's reasons were pretextual . . . ." *Id.* The court concluded:

> The State exercised seven out of twelve peremptory strikes against blacks and five against venire persons who were not black. The State tendered a total of four potential black jurors, two of whom the defendant struck. The resulting jury included two black veniremen. The State offered reasons for the strikes that the trial court considered race-neutral, and the defense failed to rebut those reasons. Therefore, the defense did not meet its burden to show "that the facts and circumstances give rise to the inference that the prosecutor exercised the peremptory challenges with a discriminatory purpose." Considering the totality of the evidence, the trial court's ruling on Chamberlin's *Batson* challenge was neither clearly erroneous nor against the overwhelming weight of the evidence.

*Id.*

Chamberlin takes issue with the Mississippi Supreme Court's ruling, arguing that it misapplies *Batson*.

## B.     Substantive Law

In *Batson*, the United States Supreme Court adopted a case-specific, three-part test by which a defendant could establish that discrimination had occurred in the jury selection in his case. As a preliminary matter, the defendant must show that the prosecutor's use of peremptory challenges raised an inference that the prosecutor was purposefully excluding members of the defendant's race from serving on the jury. 476 U.S. at 96. (This holding has since been extended to members of any race, *Powers v. Ohio*, 499 U.S. 400 (1991), and gender, *J.E.B. v.*

*Alabama ex rel. T.B.*, 511 U.S. 127 (1994)). The defendant "may rely on 'all relevant circumstances' to raise an inference of purposeful discrimination." *Miller-El v. Dretke*, 545 U.S. 231, 240 (2005) [hereinafter *Miller-El II*].

The defendant must show that discriminatory intent motivated the strike; it is not enough to show that the strike disproportionately impacted jurors of one race. *Hernandez*, 500 U.S. at 359-60. Yet, "disparate impact should be given appropriate weight in determining whether the prosecutor acted with a forbidden intent." *Id*. at 362. Establishing a pattern or practice of strikes against black jurors is one means of establishing a prima facie case, but it is not the only way in which it may be established; showing that jurors of different races were questioned differently may also infer a discriminatory motive. *Batson*, 476 U.S. at 97.

Once the defendant establishes a prima facie case of discrimination, the prosecutor must come forward with a race-neutral explanation for his strike. *Id.* Because the burden is always on the defendant to prove discrimination, the prosecutor's explanation need not be persuasive; it must only be based on some factor other than the juror's race. *Hernandez*, 500 U.S. at 360. The prosecutor must, however, do more than simply deny that he had a discriminatory motive. *Batson*, 476 U.S. at 98. If the prosecutor offers an explanation before the trial judge determines that the defendant has established an inference of discrimination, then that showing becomes moot, and the judge should rule on the ultimate issue. *Hernandez*, 500 U.S. at 359. Even if the prosecutor's reasons are "frivolous or utterly nonsensical," the analysis does not end, but merely proceeds to the third step. *Johnson v. California*, 545 U.S. 162, 171 (2005) (citation omitted).

At the third step, the trial court must determine whether the defendant has established purposeful discrimination. *Batson*, 476 U.S. at 98. "This final step involves evaluating the persuasiveness of the justification proffered by the prosecutor, but the ultimate burden of

persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike." *Rice v. Collins*, 546 U.S. 333, 338 (2006) (quotation marks and citation omitted). "[I]mplausible or fantastic justifications may (and probably will) be found to be pretexts for purposeful discrimination." *Purkett v. Elem*, 514 U.S. 765, 768 (1995); *see also Miller-El II*, 545 U.S. at 241 (holding that when a party's proffered reason for striking a prospective juror of one race applies just as well to an otherwise similar juror of different race who is permitted to serve, that is evidence tending to prove purposeful discrimination).

Once the trial court has made its determination with respect to discriminatory intent, that determination is a finding of fact that is entitled to a presumption of correctness. *Hernandez*, 500 U.S. at 364. When a *Batson* challenge is considered in the context of habeas review, the federal court cannot ordinarily reject the state court's determination unless it was "an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *Rice*, 546 U.S. at 338 (quoting 28 U.S.C. § 2254(d)(2)). If the findings are made by a state appellate court, rather than the trial court, they are equally entitled to the presumption of correctness. *Sumner v. Mata*, 455 U.S. 591, 592-93 (1982); *Moody v. Quarterman*, 476 F.3d 260, 268 (5th Cir. 2007). However, a finding of non-discrimination must be based on the actual reason(s) proffered by the prosecutor; neither the trial judge nor a reviewing court may substitute a better reason for the strike. *Miller-El II*, 545 U.S. at 252.[4]

A single discriminatory act in jury selection is sufficient to establish a *Batson* violation. *Snyder v. Louisiana*, 552 U.S. 472, 478 (2008) ("[T]he Constitution forbids striking even a single prospective juror for a discriminatory purpose."). In *Batson*, the Supreme Court "declined to

---

[4] "[W]hen illegitimate grounds like race are in issue, a prosecutor simply has got to state his reasons as best he can and stand or fall on the plausibility of the reasons he gives." *Miller-El II*, 545 U.S. at 252. Put simply, "*Miller-El II* instructs that when ruling on a *Batson* challenge, the trial court should consider only the reasons initially given to support the challenged strike, not additional reasons offered after the fact." *United States v. Taylor*, 636 F.3d 901, 905 (7th Cir. 2011) (quoting *Miller-El II*, 545 U.S. at 246-52).

require proof of a pattern or practice [of discrimination] because a single invidiously discriminatory governmental act is not immunized by the absence of such discrimination in the making of other comparable decisions." *Johnson*, 545 U.S. at 169 n.5 (quotation marks, citation, and brackets omitted).

C.      **Comparative Juror Analysis**

Chamberlin first takes issue with the state court's determination that, under Mississippi law, she had waived her right to a comparative juror analysis by failing to rebut the reasons given by the prosecutor for the strikes of certain jurors.  Such an analysis takes the reasons given for striking black jurors and sees whether those reasons could be equally applied to the white jurors who were accepted by the prosecution.  *Reed v. Quarterman*, 555 F.3d 364, 369 (5th Cir. 2009). The Mississippi Supreme Court held, "Because Chamberlin failed to offer any proof that the State's reasons were pretextual, the State's reasons for the challenges were the only considerations before the trial judge."  989 So. 2d at 339 (citing *Thomas v. State*, 818 So. 2d 335, 345 (Miss. 2002)).  Respondents have not directly countered this argument, but instead contend that a comparative analysis of the jurors' questionnaire answers does not support a claim of pretext.

This Court need not labor long over this issue, since the Fifth Circuit, relying heavily on the Supreme Court's opinion in *Miller-El II*, has held that, in a death penalty case, a comparative analysis of jurors is appropriate even where defense counsel did not rebut the prosecutor's stated reasons for striking black jurors.  *Woodward v. Epps*, 580 F.3d 318, 338 (5th Cir. 2009).  The Fifth Circuit's review of the law "suggests that waiver does not apply in capital cases." *Id.* (citing *Reed*, 555 F.3d at 364).

Accordingly, the Mississippi Supreme Court's failure to conduct a comparative analysis was contrary to clearly established federal law requiring that analysis, as announced in *Miller-El*, which the state court failed to identify as controlling precedent. *See Bell*, 535 U.S. at 694. That means the state court's conclusion that there was no showing of purposeful discrimination was incomplete. *See Johnson v. Williams*, 133 S. Ct. 1088, 1097 (2013); *Panetti v. Quarterman*, 551 U.S. 930, 953 (2007).[5] Where the state court's factual findings of no discrimination were made without recourse to the comparative analysis required by federal law, "the factfinding procedures upon which the court relied were 'not adequate for reaching reasonably correct results' or, at a minimum, resulted in a process that appeared to be 'seriously inadequate for the ascertainment of the truth.'" *Panetti*, 551 U.S. at 954 (quoting *Ford v. Wainwright*, 477 U.S. 399, 423-24 (1986)). AEDPA deference to those factual findings is not required. *Id.*

Chamberlin "nonetheless must carry [her] burden of proving purposeful discrimination, and for purposes of our review, [s]he must demonstrate that the state court's factual findings were unreasonable in light of the evidence presented." *Woodward*, 580 F.3d at 338; *e.g.*, *Miller-El II*, 545 U.S. at 266 ("The state court's conclusion that the prosecutors' strikes of Fields and Warren were not racially determined is shown up as wrong to a clear and convincing degree; the state court's conclusion was unreasonable as well as erroneous.").

With these principles in mind, this Court will review the evidence presented by Chamberlin in state court regarding discriminatory intent in striking black jurors at her trial. In conducting a comparative analysis, the Fifth Circuit has provided the following instruction:

---

[5] Ultimately, the Mississippi Supreme Court took a backward look at the jury. It noted that the State exercised twelve peremptory strikes; seven against blacks and five against whites. *Chamberlin*, 989 So. 2d at 339. The State tendered four potential black jurors to the defense, who struck two of them. And, because the resulting jury was composed of two black jurors, the totality of circumstances, in the view of the Mississippi Supreme Court, suggested that there was no discrimination in the jury selection process. *Id.* The error was the failure to acknowledge that striking even a single juror on the basis of race violates the constitution. *See Snyder*, 552 U.S. at 478; *Miller-El II*, 545 U.S. at 247; *Batson*, 476 U.S. at 97; *see also Thiel v. S. Pac. Co.*, 328 U.S. 217, 220 (1946) ("Jury competence is an individual rather than a group or class matter.").

> "If the State asserts that it struck a black juror with a particular characteristic, and it also accepted nonblack jurors with that same characteristic, this is evidence that the asserted justification was a pretext for discrimination." [quoting *Reed*, 555 F.3d at 376]  In addition, "if the State asserts that it was concerned about a particular characteristic but did not engage in meaningful voir dire examination on that subject, then the State's failure to question the juror on that topic is some evidence that the asserted reason was a pretext for discrimination." *Id.*  Lastly, "we must consider only the State's asserted reasons for striking the black jurors and compare those reasons with its treatment of the nonblack jurors." *Id.*

*Smith v. Cain*, 708 F.3d 628, 636 (5th Cir. 2013).  Jurors need not be identical to be included in a comparative analysis.  *Miller-El II*, 545 U.S. at 247 n.6.  If the reasons for striking a black juror apply equally as well to a white juror who was retained, that is evidence of pretext.  Such evidence does not amount to *proof* of pretext, however, where the black juror was also struck for other, race-neutral reasons.  *Fields v. Thaler*, 588 F.3d 270, 277 (5th Cir. 2009).

### 1. Emma Roberts

African-American jurors Emma Roberts, Geralline Wilkerson, Brittany Burks, Thomas Sturgis, and David Minor were struck for answering "Not sure" to Question 30.  Chamberlin argues that they should be compared to the following white jurors: Patricia Mullen (28), Brannon Cooper (46), Patricia Adcock (187), Laura Peyton (216), and Rebecca Vantrease (234), who also answered "Not sure" to Question 30.

Chamberlin has picked out one reason among the several offered by the prosecutor for striking Emma Roberts, and she seeks to show pretext based only on that reason.  However, in response to Questions 34 and 35, Roberts said that she was not sure whether she would hold the state to a higher burden or required 100% proof before she could convict.  Neither Mullen, Adcock, Peyton, nor Vantrease would hold the state to a higher burden.  Vantrease would not require 100% proof for conviction.

Other questions are also relevant to Roberts' being stricken. Question 53 asked for the juror's opinion of the death penalty, giving five choices: 1. Strongly Favor; 2. Generally Favor; 3. No Opinion; 4. Generally Opposed; 5. Strongly Opposed. Question 54 asked the juror to describe his or her opinion in further detail. Roberts's response to Question 53 was, "Generally Opposed." Her response to Question 54 was, "The VI Commandment - Thou shalt not kill." In contrast, the comparative white jurors' response to Question 53 (and 54) were: Mullen: "Strongly Favor." (No detailed response); Cooper: "Strongly Favor." ("For rape, murder, child abuse, spousal abuse"); Adcock: "Generally Favor." ("I believe in the death penalty when a person does a crime that is intentional and takes the life of someone else."); Peyton: "Generally Favor." ("It would all depend on the case, the crime, the facts of the case."); and Vantrease: "Generally Favor." ("Depending on the nature of the crime and circumstances, I believe there are crimes that deserve the death penalty.").

Where the prosecutor offers several reasons for the strikes, and where some of them do not apply equally to each comparative juror, then those reasons, if they are facially valid, militate against a finding of pretext. *Fields*, 588 F.3d at 277. Here, Chamberlin seeks to compare Roberts to other jurors based solely on their answers to Question 30, despite the fact that this was not the only question that the prosecutor offered for the strike. In the Court's opinion, based on the totality of the circumstances surrounding Roberts' removal, the reasons offered by the prosecutor were not a pretext for racial discrimination.

### 2. Geralline Wilkerson

Chamberlin makes the same comparison between Geralline Wilkerson and the five white jurors named above. In striking Wilkerson, the prosecutor said that she answered "Not sure" to Questions 30, 34, and 35. "And she basically said she was of no opinion and she ranked low in

our ranks."  As stated above, Mullen, Adcock, Peyton, and Vantrease all answered "No" to Question 34, and Vantrease also answered "No" to Question 35.  Thus, the only white juror giving the same answers as Wilkerson to Questions 30 and 34 was Cooper, who also answered "Yes" when asked if he would require 100% proof.  However, as noted by the prosecutor, Wilkerson answered "No opinion" to Question 53, with no further explanation.  Cooper, in contrast, answered "Strongly Favor" when asked about the death penalty, and explained, "For rape, murder, child abuse, spousal abuse."  Again, substantive differences between the responses of Wilkerson and the white jurors in response to a question relied upon by the prosecutor preclude a finding of pretext.

Chamberlin also asserts that, when compared to the answers given by Brian Loden, a white juror, the strike of Wilkerson appears to be racially motivated.  She admits, however, that the two jurors gave different answers to Question 30 – whether they were emotionally capable of standing up in court and announcing their verdict.  Wilkerson said, "Not sure," and Loden said, "Yes."  On their feelings about the death penalty, Wilkerson responded, "No Opinion," without further explanation.  Loden also responded, "No Opinion," but added, "I don't believe the death penalty should be used that often, but if the crime is bad enough and they are proved 100% guilty, *then I have no problem with it*."  (Emphasis added.)  Thus, their responses were different in two significant aspects, and the reasons offered by the prosecutor do not amount to proof of pretext.

### 3.  Brittany Burks

When striking Brittany Burks, the prosecutor recited her answers to Questions 30 ("Not sure); 31 (asking whether she could decide the case according to the law, despite any personal opposition to the death penalty, to which she answered "Not sure"); 34 ("Yes"); 35 ("Yes"); 36

(asking whether she would be less likely to find someone guilty if death was a possible sentence, to which she answered "Yes"); and 54 (opinion on the death penalty, "I really don't care."). Additionally, Burks had a family member with a drug charge in Warren County. Again, Mullen, Adcock, Peyton, and Vantrease, while also answering "Not sure" to Question 30, all answered "No" to Question 35. Each of these jurors, as well as Cooper, had opinions on the death penalty that were substantially more favorable to the State than Burks, whose answer to Question 53 was "No opinion." On Question 36, where Burks indicated that she would be less likely to find a defendant in a capital case guilty, Adcock, Cooper, Mullen, Peyton, and Vantrease all answered "No." The circumstances surrounding the strike of Burks do not support a finding of pretext.

Chamberlin also attacks the strike of Burks because she responded on Question 50 that she had a family member who had been charged with a drug crime in 2005, while the prosecutor accepted two white jurors (Jarvis Moseley and Alice Hudson) who indicated that a family member was charged with drug possession. As stated earlier, however, the prosecutor struck Burks because of her answers to Questions 30 ("Not sure); 31 (asking whether she could decide the case according to the law, despite any personal opposition to the death penalty, to which she answered "Not sure"); 34 ("Yes"); 35 ("Yes"); 36 (asking whether she would be less likely to find someone guilty if death was a possible sentence, to which she answered "Yes"); and 54 (opinion on the death penalty, "I really don't care."). Mosely and Hudson gave markedly different responses than Burks. Each of them answered, "Yes" to Question 30, on whether they could stand up and announce their verdict. They both answered that they could put aside their feelings about the death penalty and decide the case based on the law. Moseley would not hold the State to a greater burden of proof, nor would he need 100% certainty to return a guilty verdict. Neither of them would be less likely to return a guilty verdict because it is a capital

case. Finally, with respect to their opinion on the death penalty, Mosely answered, "Strongly favor," and Hudson answered, "Generally favor." Thus, although these jurors had an answer to one question in common, the totality of the circumstances surrounding the strikes do not give rise to a finding of pretext.

### 4. Gloria Broome

Gloria Broome was struck, according to the prosecutor, because of her answers to Questions 31, 34, and 35. Mullen, Adcock, Peyton, and Vantrease all answered Question 34 in a manner more favorable to the State. Broome answered Question 31, asking whether she could put aside her feelings about the death penalty and decide the case on the law, "No." Adcock, Cooper, Mullen, Peyton, and Vantrease all answered that question "Yes." The Court is satisfied that these facts fail to establish pretext.

### 5. Katrina Carpenter

The prosecution struck Carpenter, in part, due to her response to Question 41 that her sisters were attorneys. According to the prosecutor, "we always look at lawyers or anybody close to lawyers." Chamberlin contends, however, that the prosecutor accepted five white jurors who indicated, in response to the same question, that they had a close family member or close friend who had studied law: Emily Hall, Edward Buelow, Jr., Charles Langford, Jarvis Moseley, and Anthony Crist. Chamberlin argues that this difference in treatment is proof of pretext.

Carpenter was also struck, though, because of her answer to Question 54, explaining her view on the death penalty, "I would have a problem seeking a verdict of death without concrete evidence." Additionally, the prosecutor struck her for her answer to Question 56, which asked for any other information about her as a potential juror. She responded, "I would not feel comfortable as a juror in a case seeking the death penalty because of fear of retaliation against

self or family."  In explaining that strike, the prosecutor noted, "That's a very strong reason."  In contrast, Hall explained her view of the death penalty as, "If a person has been convicted of a very serious crime involving the loss of life to another person, and is considered a serious risk to society, I would be in favor of the death penalty."  Buelow wrote, "I believe the death penalty is appropriate in some cases but under current law is not administered properly."  Crist said, "If someone willfully and knowingly kills someone else for personal gain with no remorse at that time, then they should be put to death."  Moseley said he strongly favored the death penalty, adding, "The punishment should fit the crime."  Finally, Langford's opinion was, "Let the punishment fit the deed/crime."  Thus, although these jurors answered one question similarly, their answers to other questions were completely at odds, and these facts do not establish that the reasons for Carpenter's strike were a pretext for racial discrimination.

### 6.      Thomas Sturgis and David Minor

The strikes of Sturgis and Minor are much more problematic.  The prosecutor claimed he struck Sturgis and Minor because of their answers to Questions 30, 34, and 35.  Each of the comparative white jurors gave more prosecution-favorable answers to 34 and 35, except for Cooper, who gave the same answers as Sturgis and Minor.  In fact, Cooper's responses mirror Sturgis and Minor's.

Responses to questions other than 30, 34, and 35 cannot be considered, as they were not given as justification by the prosecution. *Miller-El II*, 545 U.S. at 252.  In any event, a perusal of some of the other responses would not help the prosecution's case.  They showed that Sturgis had a relative who worked as a correctional officer and Minor had a relative in law enforcement. But Cooper had no such ties.  Although neither Sturgis nor Minor had an arrest record, Cooper

had been arrested for DUI.[6]  Sturgis and Minor reported no contact with the District Attorney's office, but Cooper had an experience where his ex-wife threatened his current wife.

As far as their opinions on the death penalty, Sturgis answered "Generally favor," with no more detail; Minor answered "No opinion," without further explanation; and Cooper answered "Strongly favor," and added "for rape, murder, child abuse, spousal abuse."  While this might have made Cooper a slightly more desirable juror, it was not a rationale offered by the prosecutor, despite the fact that he had several chances to augment the record on that score.  *See id.*; *Smith*, 708 F.3d at 636.  He ended his discussion on both Sturgis and Minor with the phrase, "I believe that's it on that one."  After defense counsel had argued that the reasons given to strike Sturgis and Minor appeared to be racially motivated, the trial court asked for further argument, and the prosecutor responded, "None other than what we made . . . ."

Clearly, then, Cooper was permitted to remain on the jury even though his answers to the three questions given as the basis for striking Sturgis and Minor were identical.  Other questionnaire responses, although not given as justification by the prosecution, also support a finding of pretext.[7]  *See Miller El II*, 545 U.S. at 252 (noting the "pretextual significance" when prosecutors' "stated reason does not hold up").  In *Miller-El II*, the Supreme Court reversed a conviction because the reasons for striking two of ten potential black jurors strongly supported a finding of pretext, even though the justifications for striking the remaining eight were "closer calls."  *Id.* at 252 n.11; *see also Reed*, 555 F.3d at 381 n.12.  The fact that only a couple of the

---

[6] It appears Cooper wrote "DUI" but it could be "DWI."  The difference between the two does not matter because he informed the parties and the court that he had been arrested.

[7] It is remarkable just how similar these three jurors were in their experiences: each obtained education beyond high school; each was employed; neither had any military experience; each read the Vicksburg Post daily; each watched television regularly; and fishing was among their hobbies.  Cooper and Sturgis were married and each had served on a jury before, while Minor answered "NO" to those questions.  Finally, the court notes that Cooper said he had health concerns which he felt would "hinder or prevent [him] from serving as a juror."  *See* Question No. 55.  He added, "Rheumatoid arthritis cannot sit for long periods of time."  Neither Minor or Sturgis expressed any such limitations.  As among these three jurors, there is little doubt that a prosecutor would not want a juror to serve who believed that he or she would be hindered or prevented from serving because of a health condition.

strikes were discriminatory was enough; as the Supreme Court has held, "The Constitution forbids striking even a single prospective juror for a discriminatory purpose." *Snyder*, 552 U.S. at 478 (citations and brackets omitted). The fact that two of the black veniremen in this case were struck for reasons not applied to a white juror is, therefore, sufficient proof of pretext to conclude that a *Batson* violation occurred.

## CONCLUSION

Citizens of this great nation engage in public service in a multitude of ways. Voting and jury service are among the most valuable and important kinds of service. "Indeed, with the exception of voting, for most citizens the honor and privilege of jury duty is their most significant opportunity to participate in the democratic process." *Powers*, 499 U.S. at 407. It is also an opportunity open to a broad portion of the population. One needs no special skill or training to be the most powerful person in a courtroom.

Voting and jury service reflect the most fundamental of American principles: that our fate lies in the hands of our peers. It is because we cherish this principle that juries can make life or death decisions. In this case, the jury's decision meant death.

Some may wonder why constitutional error in the jury's selection necessitates a new trial, especially given the horrific murders committed in this case. But the Supreme Court has many times explained that a discriminatory jury selection process unforgivably taints a guilty verdict. Discrimination in picking a jury "causes harm to the litigants, the community, and the individual jurors who are wrongfully excluded from participation in the judicial process." *J.E.B.*, 511 U.S. at 140.

Since *Batson*, the Court has repeatedly affirmed that individual jurors have the right to be free from stereotypes, discrimination, and discriminatory classifications. *Id.* at 140-41 (citing

*Powers*, 499 U.S. at 412).  It has written that "if race stereotypes are the price for acceptance of a jury panel as fair, the price is too high to meet the standard of the Constitution."  *Edmondson v. Leesville Concrete Co*., 500 U.S. 614, 630 (1991); *see also Georgia v. McCollum*, 505 U.S. 42, 58-59 (1992).  Being excluded from jury service on account of one's race obviously harms that individual juror.

But there are consequences to our system of justice, too.  "A prosecutor's wrongful exclusion of a juror by a race-based peremptory challenge is a constitutional violation committed in open court at the outset of the proceedings."  *Powers*, 499 U.S. at 412.  If such conduct – occurring underneath the American flag and with the appearance of approval by the court itself – goes unchecked, the court and the judiciary become willing participants in that discrimination.  *See Edmonson*, 500 U.S. at 628 ("Racial bias mars the integrity of the judicial system . . . .").

These values were well-stated in the Supreme Court's decision in *J.E.B.*, which guaranteed that women could not be excluded from jury service on account of their gender.

> Equal opportunity to participate in the fair administration of justice is fundamental to our democratic system.  It not only furthers the goals of the jury system.  It reaffirms the promise of equality under the law – that all citizens, regardless of race, ethnicity, or gender, have the chance to take part directly in our democracy.  When persons are excluded from participation in our democratic processes solely because of race or gender, this promise of equality dims, and the integrity of our judicial system is jeopardized.

*J.E.B.*, 511 U.S. at 145-46 (citation omitted).

At heart, Americans will not have confidence in a system of justice which allows individuals to be denied participation in this critical part of our democracy.  *See Powers*, 499 U.S. at 413 ("The verdict will not be accepted or understood in these terms if the jury is chosen by unlawful means at the outset.").  And the judiciary cannot acquiesce to misplaced beliefs that would ultimately undermine public confidence in the system, or "invite[] cynicism respecting the

jury's neutrality and its obligation to adhere to the law." *Id.* at 412.  In order for our nation to remain strong, its people must have faith in the fairness of the jury system.

In this case, these words have special resonance:

> For some, jury service is their first experience with the legal system.  Jury service teaches them about courts, procedures, and the law. For others, jury duty has particular significance because it is a badge of full citizenship.  Voting and jury service are the two opportunities for citizens to participate in the democratic process.  For women and African-Americans, who fought for these badges of citizenship, jury service has added meaning.  For all jurors, jury duty provides an opportunity to see the law in action. The verdict that the jury reaches affects the parties directly in front of them. The immediacy and importance of the jury's work is strongly felt by all present in the courtroom. . . .

> Nowhere is the jury's function . . . more critical than in death penalty cases.  When the life or death of the defendant is at stake the jury must display the utmost vigilance.

Nancy S. Marder, *Justice Stevens, the Peremptory Challenge, and the Jury*, 74 Fordham L. Rev. 1683, 1721-22, 1725 (2006).

~   ~   ~

Because the jury selection process violated the Supreme Court's teachings in *Batson*, the Court finds that habeas relief is appropriate, and Chamberlin's Petition for Writ of Habeas Corpus will be granted.  Having reached that conclusion, discussion of the other issues raised in the Petition is unnecessary.

IT IS, THEREFORE, ORDERED that the Petition for Writ of Habeas Corpus filed by Lisa Jo Chamberlin is hereby **granted** as to her claim that the jury selection process in her case impermissibly discriminated against African-American jurors.  A separate judgment will be entered this day in accordance with Federal Rule of Civil Procedure 58.

IT IS FURTHER ORDERED that Chamberlin's conviction and sentence are hereby set aside, and she shall be released from custody unless the State of Mississippi grants her a new trial within 120 days of the entry of this Order.

IT IS SO ORDERED this the 31st day of March, 2015.

s/Carlton W. Reeves
UNITED STATES DISTRICT JUDGE